**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

Carrie C.,

                     **Plaintiff,**

      **v.**                              **Civil Action 2:21-cv-680
Judge Sarah D. Morrison
Magistrate Judge Jolson**

COMMISSIONER OF
SOCIAL SECURITY,

                     **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.    BACKGROUND

On March 21, 2011, Plaintiff protectively filed an application for DIB alleging disability beginning October 18, 2010. (Tr. 86–106). Following several adverse decisions at the administrative level, Plaintiff appealed to this Court. (*Id.; see also Carter v. Comm'r of Soc. Sec.*, No. 2:14-cv-244 (S.D. Ohio)). In January 2014, after this Court upheld the Administrative Law Judge's ("ALJ") denial of Plaintiff's first application, Plaintiff again protectively filed an application for DIB, still alleging disability beginning October 18, 2010. (Tr. 222–225). After this application was denied both initially and on reconsideration, the ALJ held a hearing on September 15, 2016. (Tr. 38–85). The ALJ denied Plaintiff's second application in a written decision on February 15, 2017. (Tr. 11–37). When the Appeals Council denied review, that denial became the final decision of the Commissioner. (Tr. 1–5).

Next, on March 16, 2018, Plaintiff again appealed the final decision of the Commissioner in this Court. *See Carter v. Comm'r of Soc. Sec.*, No. 2:18-cv-224 (S.D. Ohio); (Tr. 1197–99). This Court once again remanded the case to the Commissioner. (Tr. 1200–1221). After the Appeals Council issued a remand order (Tr. 1223–1231), a telephone hearing was held on September 17, 2020. (Tr. 1149–1164). Plaintiff's application was denied again on October 27, 2020. (Tr. 1122–1148). Plaintiff did not request review by the Appeals Council, opting instead to file the instant lawsuit on February 16, 2021. (Doc. 1).

The Commissioner filed the administrative record on August 2, 2021 (Doc. 10). The matter has been briefed and is ripe for consideration. (Docs. 11, 12, 15).

### A.    Relevant Hearing Testimony

The ALJ summarized the testimony from Plaintiff's most recent hearing:

[Plaintiff] testified at her September 17, 2020 disability hearing that she was unable to work primarily because of problems with carpal tunnel syndrome and severe low back pain. She had surgery on the left with improvement, but though she had surgery on her dominant right-hand it still gave her problems. She was unable to hold things for very long or write for very long because of pain. She was unable to sit or stand for very long because of low back pain, and had to change positions frequently throughout the day.

(Tr. 1133).

[Plaintiff] testified that she needed to change positions from sitting to standing continuously throughout the day, and notice is taken that if she had to switch positions as much as she has alleged, such an accommodation would be disabling.

(Tr. 1134).

### B.    Relevant Medical Evidence

The ALJ also summarized Plaintiff's medical records and symptoms related to her impairments during the relevant period:

The review of evidence and testimony and analysis of opinion evidence provided in the Administrative Law Judge decision of February 11, 2017, adequately

2

summarized the evidence relevant to the period under consideration and is hereby incorporated by reference (Exhibit B- 9A/B-1A through B-36F).

(Tr. 1133).

The most significant impairments appear to be [Plaintiff]'s residual limitations following right carpal tunnel surgery, as her symptoms were improved by carpal tunnel surgery on the left, and low back pain due to lumbar degenerative disc disease. With respect to her right upper extremity impairments, hand endoscopic surgeon Michael Shannon, M.D. does record ongoing complaints of right-hand pain (Exhibits B-6F/1-5, B-14F/1-3, B-25F, B-33F), however, her discomfort is generally described in mild to moderate terms, [e.g.] "some aching discomfort and pain" (Exhibit B- 13F/18), "ongoing numbness and aching in forearms" (Exhibit B-14F/2), some pain in her right hand with medication, (Exhibit B-25F/3). Despite continuing to report pain symptoms for which she was given opiate pain medication, Dr. Shannon's his notes all show "good strength" and reflexes, except some decreased hand grasp and positive Tinel's, identified in a partially legible note that appears to reflect the left hand" (Exhibit B-13F/18). There are no occasions on which Dr. Shannon or any other physician observed signs of any decreased right upper extremity strength or any muscle atrophy, which suggests that she is using her right hand. This argues against her subjective complaints of very limited ability to use her hands. Notice is taken that activities of daily living, including caring for her young granddaughter, her testimony in her September 2016 disability hearing that she drove a car occasionally, taking care of her dog; caring for her disabled spouse, cleaning as she could, having a best friend, and shopping with her disabled husband (Exhibit B-9F). In March 2015 she reported that she was food shopping (Exhibit B-21F/13); and in August 2015, [Plaintiff] was able to do some household chores (Exhibit B-16F). [Plaintiff] has also claimed that her husband helped her with her daily activities before her sons moved in, but her counseling notes reflect that during much of that period she reported that her husband was on heavy painkillers, and she described him as "strung out" (Exhibit B-22F/3) or "in a stupor most of the time" (Exhibit B-8F/33), which casts serious doubt on the extent to which he was actually helping her and doing all the household chores and shopping, etc. as she claimed. In fact, in June 2016 [Plaintiff] stated that she was tired from being her husband's caregiver (Exhibit B-31F).

(Tr. 1133–1134).

But, while she has consistently sought treatment for back pain during the period under consideration, which weighs in her favor, that is overcome by reports from her medical providers that she had a normal gait (See, for example, Exhibit B-10F/1), EMG showing no evidence of active right motor radiculopathy, though possible sensory neuropathy (Id., at 20), and imaging that is relatively benign with mostly minimal to mild abnormalities noted on x-ray (Id., at 36; See also MRI at Exhibit B-4F noting mild degenerative changes at L3-L4 in December 2013 with no significant disc herniation or stenosis). Exam show normal 5/5 motor strength

generally (See, for example, Exhibit B-4F/1, B-10F/3-4, B-24F/164-171, B-27F/37-42, B-34F/13-28; But see Exhibit 10 F/2 showing only 4+/5 muscle strength in the right toe in July 2014, though [Plaintiff] was also observed to have otherwise 5/5 muscle strength, normal gait, and no atrophy in the lower extremities). [Plaintiff] generally reported significant improvement from her injections, ablations, and other interventions (See, for example, Exhibit B-11F/8, noting that [Plaintiff] "has responded quite well to lumbar facet joint injections and medial branch blocks… A burning sensation in her low back… is quite manageable and tolerable… Pain is quite intermittent and manageable"). Her pain management physician generally notes that [Plaintiff] is, "seated comfortably. Ambulates without difficulty [and/or] gait is not antalgic" (Exhibit B-24F/131, 141, 156, 162, 168). At one visit, her provider observed that [Plaintiff] had 1-2 beats of clonus in the right lower extremity, but this appears to have resolved as of next visit, when no clonus was noted (Id., at 162, 165). The clinical picture painted by these treatment notes is not consistent with [Plaintiff]'s assertion that she was obliged to change position constantly from seated to standing to walking continuously throughout the day, due to back pain.

(Tr. 1134).

### C. The Most Recent ALJ's Decision

The ALJ found that Plaintiff last met the insured status requirement through December 31, 2015, and did not engage in substantial gainful employment during the period from her alleged onset date of December 1, 2012 (the date after the prior ALJ decision) through her date last insured of December 31, 2015. (Tr. 1128). The ALJ determined that, through her date last insured, Plaintiff had the following severe impairments: Bilateral carpal tunnel syndrome, obesity, lumbar degenerative disc disease and spondylosis with radiculopathy, anxiety disorder, PTSD; and adjustment disorder with depression. (*Id.*). Still, the ALJ found that, through her date last insured, none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 1129).

As to Plaintiff's residual functional capacity ("RFC"), through the date last insured, the ALJ opined:

[Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that [Plaintiff] must be allowed to change position after 45

4

minutes to sit or stretch 1-2 minutes. Push or pull is limited as per exertional weight limits for light exertional work, and to the occasional level. She should never climb ladders, ropes, or scaffolds, crawl, or kneel. She may occasionally climb ramps and stairs, stoop, and crouch. Handling and fingering with the right is limited to the frequent level. She can perform limited to simple and moderately complex but routine tasks at an average pace. No jobs with strict time or production or quota demands, fast pace, extended periods of sustained attention/concentration or more than daily planning, so she is limited to goal based production where work is measured by end result. [Plaintiff] is able to adapt to occasional new tasks that are well explained and demonstrated. She can work in low stress jobs, defined as only occasional changes in the work setting where changes can be explained in simple terms, with assistance at times when initially performing new tasks. She can occasionally interact with coworkers and supervisors, but should have no contact with the general public. No required work can involve influencing others to follow instructions, demands or handle criticism.

(Tr. 1132).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence." (Tr. 1137–1138).

The ALJ determined that, through the date last insured, Plaintiff was unable to perform her past relevant work as a patient transport associate. (Tr. 1138). Relying on the vocational expert's testimony, the ALJ concluded that, through the date last insured, Plaintiff could perform jobs that exist in significant numbers in the national economy, such as a weight recorder, copying machine operator, or office helper. (Tr. 1138–1139). He therefore concluded that Plaintiff "was not under a disability, as defined in the Social Security Act, at any time from October 18, 2010, the alleged onset date, through December 31, 2015, the date last insured (20 CFR 404.1520(g))." (Tr. 1139).

## II.    STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial

evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

In her Statement of Errors, Plaintiff contends that: (1) the ALJ improperly evaluated the opinions provided by the state agency psychologist, Karen Terry, Ph.D.; (2) the ALJ improperly evaluated the opinion from treating hand surgeon, Michael Shannon, M.D; and (3) the ALJ's decision should be reversed because the ALJ originally issued a decision denying benefits to Plaintiff before the ALJ had been properly appointed. (Docs. 11, 15).

The Commissioner counters that the ALJ reasonably evaluated the medical opinions at issue. The Commissioner further counters that Plaintiff's separation of powers argument does not entitle her to a rehearing of her disability claim. (Doc. 12).

### A. Evaluation of State Agency Psychologist Dr. Terry's Opinion

At the outset, in order to determine the appropriate weight Dr. Terry's opinion should be afforded, it is important to identify which type of medical source he is. "The Social Security Administration defines three types of medical sources: non-examining sources, non-treating (but examining) sources, and treating sources." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 273 (6th Cir. 2015) (citing 20 C.F.R. § 404.1502). When the opinion comes from a non-treating or non-

6

examining source, it is usually not entitled to controlling weight. 20 C.F.R. § 404.1527(c)(2).

Rather, the ALJ should consider relevant factors, including supportability, consistency, and

specialization. 20 C.F.R. § 404.1527(d)(2). Yet, there is no "reasons-giving requirement" for non-

treating source opinions. *Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir. 2016).

Rather, the ALJ must provide only "a meaningful explanation regarding the weight given to

particular medical source opinions." *Mason v. Comm'r of Soc. Sec.*, No. 1:18 CV 1737, 2019 WL

4305764, at *7 (N.D. Ohio Sept. 11, 2019) (citing SSR 96-6p, 1996 WL 374180, at *2). As Plaintiff

concedes, Dr. Terry is a non-treating medical source. (Doc. 11 at 9.) So the ALJ was required only

to provide "a meaningful explanation regarding the weight given" to Dr. Terry's opinion. *Id.*

When discussing Dr. Terry's opinion evidence, the ALJ found:

> With regard to the opinion evidence, the analysis of treating source opinions in the administrative Law Judge decision of February 11, 2017 is generally adopted here, except for the opinions of Dr. Shannon and non-examining psychologist Karen Terry, Ph.D. (Exhibit B-2A), as required in the District Court Magistrate Report (Exhibit B-12A).

(Tr. 1134–1135).

> With regard to the opinion evidence, careful consideration is given to the opinion of Karen Terry, Ph.D., a psychological consultative for the BDT, who opined in [Plaintiff]'s initial disability determination that [Plaintiff] was able to complete simple, routine, 1 to 3 step tasks that do not involve extended periods of sustained attention/concentration or more than daily planning and do not have fast-paced performance or strict production quota requirements. At times may need some assistance when initially performing new tasks. Dr. Terry opined that [Plaintiff] "can relate to others on a superficial level. Claimant should not be required to influence others to follow instructions, demands, or handle criticism" (Exhibit B-2A/11). In the administrative Law Judge decision of February 11, 2017, the Administrative Law Judge gave little weight to the opinions of the State agency psychologists as she indicated that the psychologists adopted the mental limitations by the prior ALJ, which she was not adopting based on new and material evidence since that time (Exhibit B-9A/15). When reviewed by the Commissioner, it was found that while the assertion that Dr. Terry's opinion was an adoption of findings in the November 30, 2012 Administrative Law Judge decision was inaccurate, the error was harmless. The District Court disagreed, finding that the error is not harmless, as the Administrative Law Judge did not incorporate and was not

consistent with Dr. Terry's limitation to "superficial contact", that is, not requiring [Plaintiff] "to influence others to follow instructions, demands, or handle criticism" (Exhibit B-12A/10-11 siding Exhibit B-2A/11 and B-9A/15). Notice is taken that the Administrative Law Judge in the February 2017 ALJ decision did not adopt the November 2012 ALJ mental limitations under Drummond, because of evidence showing some short[-]term memory problems, some fidgeting, and generally considering [Plaintiff]'s situational stressors and pain complaints, resulting in more conservative mental limitations, relying principally on the findings of the consultative psychological examiner. Careful consideration has been given to the findings in the Magistrate Report and Recommendations, as well as to opinion evidence, objective evidence and claimant testimony related to her mental impairments. Dr. Terry's opinion is partially persuasive, as it is not consistent with medical evidence of record including the consultative psychological examination described in Exhibit B-9F. Dr. Terry is a non-examining source and has misinterpreted the consultative examiner's opinion. Notice is taken that the consultative examiner is an examining source. The CE, Stephen Meyer, PhD, stated, "She does interact with her neighbors. She denied having any problems getting along with authority figures…" She spends time with her children and…grandchild…She has a best friend, and she also talks with neighbors." (Exhibit B-9F/2).

The CE described her as "cooperative" (Id., at 3). "[Plaintiff] did not report a history of problems getting along with others. She socializes regularly with family, friends, and neighbors. She was open and cooperative during today's assessment…She is expected to be able to perform in a setting with low social requirements, with at most occasional contact with coworkers and supervisors" (Id., at 5). The reports by [Plaintiff] and observations of the consultative evaluator do not comport with Dr. Terry's assessment that [Plaintiff] would be unable to engage in more than "superficial" interaction. This assessment also does not comport with the general medical evidence of record. For example, mental health treatment notes consistently describe [Plaintiff] as, "She was cooperative, calm, and talkative." (See, for example, Exhibits B-8F/13, 14, 16, 17, 19, 20, 21, 23, 24, 26, 27, 29, 30, 31, 33, 34, 35, 37, 38, B-21F/3, 5, 7, 9, 13, 15, 17, 19, and B-20 2F/1, 5, 7, 9 13, 15, 17; But see Exhibit B-8F/12, where [Plaintiff] was observed to be cooperative, a bit anxious, and talkative). [Plaintiff]'s pain management physician describes her as pleasant (Exhibit B-24F/169, 176, B-20 7F/48, 55). Further, [Plaintiff]'s counselor from the Muskingum County Counseling Center completed a functional capacity form in October 2015, on which she endorsed selections indicating that [Plaintiff] had no limitations in any functional abilities related to social interaction (Exhibit B-18F/1). Although this opinion is given little weight, it is accepted as support for the conclusion that [Plaintiff]'s social functional limitations are not disabling. Because Dr. Terry's opinion is not consistent with other evidence of record, it is given only partial weight. The functional capacity above does provide social limitations consistent with [Plaintiff]'s allegations of irritability due to pain and anxiety, consistent with the opinion of [Plaintiff]'s consultative psychological evaluator at Exhibit B-9F.

. . .

> With respect to her alleged mental impairments, the undersigned finds the record continues to support limitation on social interaction, as well as on the complexity, stress, and pace of work-related activities, based on [Plaintiff]'s ongoing mental health treatment in reports of her counselors. As discussed above, the limitation to "superficial" interaction is not adopted as it is vague and poorly supported, although the prohibition against work that involves influencing others to follow instructions, demands, or handle criticism is adopted here as it is well supported by objective evidence of record (See Exhibit B-2A). The opinion of the BDD psychological evaluator in the reconsideration determination at Exhibit B-4A, adopting the finding in the Administrative Law Judge decision of November 30, 2012, which limited [Plaintiff] to a low stress work identified as minimal contact with others at the worksite with few changes in the work setting (See Exhibit B-1A/8), is given little weight, as the limitations provided are vague, evidence received in connection with the instant disability application and discussed above supports a conclusion that [Plaintiff] is more limited with respect to her mental impairments since the November 2012 Administrative Law Judge hearing. The Administrative Law Judge decision of February 2017 provided adequate discussion and analysis of the inconsistencies between [Plaintiff]'s testimony and the documentary record (Exhibit B-9A/16-18), supporting a conclusion that [Plaintiff]'s reports of her symptoms and limitations in documents and testimony to Social Security are not wholly supported by objective evidence of record. Accordingly, that analysis and conclusions are adopted here.

(Tr. 1135–1137).

The above explanation satisfies the regulations. Specifically, the ALJ provided a "meaningful explanation" as to why he found Dr. Terry's opinion about Plaintiff's ability to interact socially unpersuasive. The ALJ noted, "Dr. Terry's assessment that [Plaintiff] would be unable to engage in more than 'superficial' interaction" was inconsistent with the consultative psychological examination. (Tr. 1136). Though Plaintiff says otherwise, a review of the consultative examiner's report confirms the ALJ's read. The consultative examiner ("CE") stated that Plaintiff interacted with neighbors, spent time with her children and grandchild, had a best friend, and denied having any problems getting along with authority figures. (Tr. 477–80, 1136). Additionally, she was cooperative during the examination and reported that she has no difficulty getting along with others.

*Id*.  The CE concluded, after examining Plaintiff, that she would be "expected to be able to perform in a setting with low social requirements, with at most occasional contact with coworkers and supervisors."  (Tr. 480, 1136).

Additionally, the ALJ noted that Dr. Terry's opinion regarding Plaintiff's ability to engage in only superficial social interactions did "not comport with the general medical evidence of record."  (Tr. 1136).  For instance, mental health treatment notes routinely describe Plaintiff as "cooperative, calm, and talkative."  (Tr. 1136 (citing Tr. 448–49, 451–52, 454–56, 458–59, 461–62, 464–66, 468–70, 472–73, 606, 608, 610, 612, 616, 618, 620, 622, 624, 628, 630, 632, 636, 638, 640)).  Further, Plaintiff pain management physician described her as "pleasant" on many occasions (Tr. 1136 (citing Tr. 842, 849, 960, 976)).  And Plaintiff's counselor from the Muskingum County Counseling Center completed a functional capacity form in October 2015, and opined that Plaintiff had no limitations in any functional abilities related to social interaction.  (Tr. 1136–37 (citing Tr. 594)).

What is more, the ALJ considered contrary evidence, noting that Plaintiff was observed to be "a bit anxious" on at least one occasion (Tr. 1136 (citing Tr. 447)).  Elsewhere, the ALJ discussed how Plaintiff was noted to be irritable at times when discussing her family and physical problems and that, during the consultative examination, Plaintiff was reported to be mildly impulsive and fidgety but still interacted appropriately with the CE.  (Tr. 1131 (citing Tr. 478–79, 604, 620)).  In Reply, Plaintiff makes much of the ALJ's use of the words "vague and unsupported" when describing Dr. Terry's opinion.  But, in context, the ALJ's description is understandable and supportable.  The ALJ explained that, from his view, Dr. Terry's read of the record was incomplete.  Notably, the ALJ took care to analyze whether Plaintiff's actions could be more than superficial, and he did not, as Plaintiff asserts, conflate occasional and superficial.  *Cf. Runyon v. Comm'r of*

*Soc. Sec.*, No. 2:20-cv-3820, 2021 U.S. Dist. LEXIS 136427 (S.D. Ohio July 22, 2021).

There was no error, and the ALJ properly evaluated Dr. Terry's opinion.

### B. Evaluation of Treating Physician Dr. Shannon's Opinion

Dr. Shannon, Plaintiff's hand surgeon, offered three separate opinions, one of which was a functional limitation assessment. Plaintiff challenges the ALJ's treatment of that assessment.

### 1. Treating Physician Rule

Because Dr. Shannon is a treating physician, two related rules govern how the ALJ was required to analyze his opinion. *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016).[1] The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (alterations in original)); *see also* 20 C.F.R. § 404.1527(c)(2); *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550–51 (6th Cir. 2010). In order to meet the "good reasons" standard, the ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight

---

[1] Effective for claims filed after March 27, 2017, the Social Security Administration's new regulations alter the treating physician rule in a number of ways. *See* 20 C.F.R. §§ 404.1527, 416.927 (2016). Plaintiff's claim was filed in 2014 so the prior regulations apply.

the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (internal citation and quotation marks omitted). "Because the reason-giving requirement exists to 'ensur[e] that each denied claimant receives fair process,' we have held that an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and explaining precisely how those reasons affected the weight' given 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified upon the record.'" *Blakely* 581 F.3d 399 (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d at 243 (alterations in original)). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

*2. Application*

In brief, Dr. Shannon opined that Plaintiff could: Rarely lift one to five pounds; rarely reach with her left and right arm; never handle or finger with her right hand and rarely handle or finger with her left hand; stand and walk for less than one hour at one time; sit for 15 minutes at one time; never use her feet for repetitive movements, such as operating foot controls; occasionally bend and

squat but never crawl, climb steps, or climb ladders; and occasionally reach above shoulder level with her left arm, but never on her right side.  (Tr. 590–93).

The ALJ found Dr. Shannon's opined limitations too extreme, noting in relevant part:

> Dr. Shannon, the claimant's treating neurosurgeon, offered three statements regarding the claimant's ability to function. On February 4, 2015, Dr. Shannon stated that found the claimant permanently and totally disabled (Exhibit B-15F). In August 2015 he again stated that he believes that the claimant is a candidate for permanent disability (Exhibit B-16F). And, on September 9, 2015, Dr. Shannon completed a functional assessment form that basically limited the claimant to less than sedentary work (Exhibit B-17F). I give little weight to Dr. Shannon's opinions for the following reasons. First, 20 CFR 404.1527(e) states that the final responsibility for determining if a claimant is "disabled" or "unable to work" is reserved for the Commissioner. The evidence does not support a conclusion that Dr. Shannon is familiar with the rules governing our program and know how properly to apply such rules. Second, many of Dr. Shannon's limitations are not supported by the relatively benign findings on his exams and objective medical imaging, as discussed above.
>
> [I find] Dr. Shannon's examination findings vague, usually limited to reiteration of the claimant's pain complaints, with occasional mental chance of nonspecific decreased grip. For example, in November 2015, he noted that the claimant continued with chronic pain and was not improved with extensive pain management and medication. He observed that she was using some Norco, however there has been no suggestion that she used it extensively or irregularly. In November, he stated that her last opiate prescription was from August, suggesting that her pain was generally managed with non-opiate medication. He did state that she had decrease in her grips, with no specific measurements or characterization of severity (Exhibit B-25F/7). However, treatment notes from pain management physician Yaya Bakdalieh, M.D., from December 2013 through March 2016, note pain management only for complaints of back pain and lower extremity radicular symptoms, and are notably absent any assertions that she is experiencing upper extremity pain (See Exhibit B/24F). Finally, Dr. Shannon's extreme limitations are not consistent with her significant activities of daily living as reported to Dr. Meyer and to her treating therapist, including reports that she was a caretaker for her sick husband, that she bore the brunt of the household duties because of her husband's illness, and significant caretaking for her young granddaughter, as well as driving, which requires gasping and reaching.

(Tr. 1135).

The ALJ provided three primary reasons for discounting Dr. Shannon's opinion.  First, he said, Dr. Shannon's opinion was not supported by the relatively benign medical findings and exams. (*Id*.).  A review of the record shows that the ALJ's conclusion has support.  Dr. Shannon's own treatment notes had imprecise examination findings and usually reported only Plaintiff's pain complaints with an occasional mention that Plaintiff had decreased grip strength (Tr. 1135 (citing Tr. 854–59)).  And the mention of decreased grip strength provided no measurement.  Other medical testing likewise undermined Dr. Shannon's opined restrictions.  For instance, Dr. Shannon found that Plaintiff could rarely reach with her right and left arm.  Yet x-rays of Plaintiff's right shoulder were normal, and no evidence shows a left shoulder impairment.  Additionally, Plaintiff went to the emergency room in 2014 and reported no distress; had normal range of motion in her neck with no neurological defects; good bilateral grip strength, and x-rays of her right shoulder were unremarkable.  (Tr. 1135 (citing Tr. 715–19)).

More still, Dr. Shannon opined that Plaintiff could not handle at all with her right hand, but the most recent EMG and nerve conduction studies of Plaintiff's right arm and hand were normal, and examinations revealed normal strength and reflexes in her right arm and hand.  (Tr. 573, 1135). Plus, Plaintiff's primary care provider reported normal upper extremity examinations in January 2015 and March 2016.  (Tr. 1135 (citing Tr. 643, 654)).

Second, the ALJ noted that Plaintiff's pain was relatively well managed.  Again, the ALJ's conclusion has record support.  Plaintiff sought pain management from December 2013 through March 2016.  But her complaints were about her back and lower extremity radicular symptoms— not upper extremity pain.  (Tr. 1135 (citing Tr. 675–852)).

Third, the ALJ rejected Dr. Shannon's opinion as inconsistent with Plaintiff's "significant activities of daily living," which included that "she was a caretaker for her sick husband, that she

bore the brunt of the household duties because of her husband's illness, and significant caretaking for her young granddaughter, as well as driving, which requires gasping and reaching." (Tr. 1131, 1135 (citing Tr. 477–78, 589, 616, 626, 634, 1023, 1025–26)). The Undersigned agrees. All of these activities require greater functional skills than those in Dr. Shannon's opinion would allow. The ALJ did not err in considering Plaintiff's reports of daily living. *See Berry v. Comm'r of Soc. Sec.*, 289 F. App'x 54, 56 (6th Cir. 2008) ("[Claimant's] ability to live independently and perform regular household activities belies her claim that she is totally disabled.").

Plaintiff takes issue with the exhibits the ALJ cited. (*See* Doc. 11 at 15–16). She correctly notes that Exhibit 25F contains records noting issues with pain and numbness, as well as Plaintiff's continued need for pain medications (*Id.* at 15). Yet the ALJ expressly considered the treatment notes from Dr. Shannon, acknowledging Plaintiff's complaints and her treatment (Tr. 1135 (citing Tr. 854–59)). Similarly, while Plaintiff is correct that Exhibits 13F and 23F are focused primarily on her lumbar impairments, the ALJ cites them to show a normal EMG and nerve conduction study and normal upper extremity examinations (Tr. 1135 (citing Tr. 573, 643, 654)). So the ALJ's citations to the record was not error.

"Plaintiff essentially argues the ALJ should have weighed the evidence differently and reached a different conclusion," but the ALJ sufficiently explained his reasoning. *Bonar v. Comm'r of Soc. Sec.*, No. 2:20-cv-4399, 2021 WL 4942713, at *1 (S.D. Ohio Oct. 22, 2021) (internal citations omitted). "Further, the ALJ's analysis is supported by substantial evidence, even if the opposite conclusion would also have been supportable." *Id*; *see also Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 400 (6th Cir. 2018) (it is "not for us" as the court to decide if there is evidence in support of the plaintiff's position; under the substantial evidence standard, the court "decide[s] only whether there was substantial evidence to support the ALJ's decision."); *Ulman v.*

*Comm'r of Soc. Sec.*, 693 F.3d 709, 713–14 (6th Cir. 2012) ("As long as the ALJ cite[s] substantial, legitimate evidence to support his factual conclusions, we are not to second-guess.").  The ALJ did not err.

### C.    Appointment of ALJ

Plaintiff also contends that remand is required because a statute that provided tenure protection to the former Commissioner of Social Security, Andrew Saul, violated the separation of powers doctrine, and therefore, the decision to deny him benefits was made by individuals who lacked a proper delegation of power to make benefits determination.  This contention lacks merit.

#### 1.    *Plaintiff's Constitutional Claim is Procedurally Improper*

As an initial matter, the claim is procedurally improper.  Plaintiff's Complaint does not include any Constitutional claims.  (Doc. 4).  Rule 8(a)(2) of the Federal Rules of Civil Procedure provides, however, that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Although a complaint need not provide "detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell v. Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  At a minimum, a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Id*.  Here, the United States Supreme Court case upon which Plaintiff bases her Constitutional claim was decided on June 20, 2020.  Yet Plaintiff gave no notice, let alone fair notice, of her Constitutional claim in his March 05, 2021 Complaint.  *See John R. v Comm'r of Soc. Sec.*, Case No. C20-6176-MLP, 2021 WL 5356719, *7 (W.D. Wash. Nov. 16, 2021) (finding that a plaintiff failed to comply with Rule 8 by failing to plead a separation of powers claim in complaint seeking judicial review of Commissioner's decision to deny benefits); *Shannon R. v. Comm'r of Soc. Sec.*, Case No. C21-5173, 2021 WL 5371394, at * 6–7 (Nov. 18, 2021) (same).

For that reason, he failed to comply with Rule 8.

2.      *Plaintiff's Constitutional Claim Lacks Merit*

But even if Plaintiff's Complaint was rule compliant, her Constitutional claim lacks substantive merit.  Removal of the Commissioner is governed by 42 U.S.C. § 902(a)(3) which provides that the Commissioner may only be removed from office "pursuant to a finding by the President of neglect of duty, malfeasance in office."  *Id*.  The parties agree that two recent United States Supreme Court cases cast doubt on the constitutionality of that provision.

In *Seila Law LLC v. Consumer Financial Protection Bureau*, the Supreme Court held that a provision that allowed the president to remove the Director of the Consumer Financial Protection Bureau ("CFPB") only for "inefficiency, neglect of duty, or malfeasance of office," 12 U.S.C. § 5491(c)(3), violated the separation of powers doctrine by insulating the director from removal by the President.  140 S.Ct. 2183, 2197 (2020).  In *Collins v. Yellin*, decided one year later, the Supreme Court held that a provision limiting the President to removing the Director of the Federal Housing Finance Agency ("FHFA") only for cause similarly violated the separation of powers doctrine.  141 S.Ct. 1761, 1783 (2021) (holding that "*Seila Law* is all but dispositive").  Plaintiff asserts that like the Directors of the CFPB and the FHFA, the Commissioner of Social Security is a single officer at the head of an administrative agency, and therefore, §902(a)(3)'s attempt to impose any restraints on the President's power to remove the Commissioner also violates the separation of powers doctrine.  The Commissioner agrees.  (Doc. 12 at 3) (citing Office of Legal Counsel, U.S. Dep't of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021)).

Plaintiff further asserts that because this removal provision is unconstitutional, any delegations of power by Former Commissioner Saul, including delegations of authority to ALJs or

the Appeals Council who determined her benefits claims, were invalid. The Commissioner contends that Plaintiff's argument fails because the ALJ who determined Plaintiff's claim on October 27, 2020, held office on that date, not because of a delegation of authority from Former Commissioner Saul, but because of a ratification of delegated authority in July 2018,[2] by Former Acting Commissioner Nancy Berryhill. (Doc. 12 at 5). And the Commissioner correctly notes that an Acting Commissioner is not subject to § 902(a)(3)'s removal provision, and therefore that provision's constitutionality, or lack thereof, is irrelevant. *See Collins*, 141 S.Ct. at 1781 (because the FHFA removal restrictions only applied to the Director, "any constitutional defect in the provisions restricting the removal of a confirmed Director would not have harmed [the plaintiffs], and they would not be entitled to any relief" from actions of the Acting Director who enjoyed no such removal protections); *Thomas E. v. Comm'r of Soc. Sec.*, C21-5107-BAT, 2021 WL 5415241, *5 (W.D. Wash. Nov. 19, 2021) (finding no constitutional injury where ALJ's appointment was ratified by Acting Director Berryhill who, as Acting Director, was not subject to the removal provision in § 902(a)(3)); *Alice T. v. Comm'r of Soc. Sec.*, 8:21CV14, 2021 WL 5302141, *18 (D. Neb. Nov. 15, 2021) (same); *Boger v. Kijakazi*, No. 1:20-cv-00331-KDB, 2021 WL 5023141, * 3 n.4 (W.D.N.C Oct. 28, 2021) ("Plaintiff's constitutional 'removal restriction' argument is likely not even applicable to this case because [the ALJ] was appointed by an Acting Commissioner of Social Security who could be removed from the office at the President's discretion.") (emphasis in original).

---

[2] In *Lucia*, the Supreme Court found that the United States Security Exchange Commission (SEC) ALJs were "inferior officers" under the Appointments Clause, U.S. Const. art II, § 2, cl. 2, and therefore, had to be appointed by a President, a court, or the head of an agency instead of lower-level staff. *Lucia v. S.E.C.*, 138 S.Ct. 2044, 2051 (2018). Although *Lucia* involved ALJs at the SEC, on July 16, 2018, Acting Commissioner Berryhill ratified the appointment of the Social Security Administration's ALJ's and administrative appeals judges who were previously appointed by lower-level staff in response to the ruling in *Lucia*. See SSR 19-1p, 84 Fed. Reg. 9582, (2019).

Nevertheless, Plaintiff asserts that the ALJ and the Appeals Council adjudicated her disability application pursuant to a delegation of authority from Former Director Saul. (Doc. 11 at 15–16). The Court need not resolve this factual dispute but finds instead that even if Former Director Saul appointed the ALJ and Appeals Council judges[3] who determined Plaintiff's benefits claim, the constitutionality of § 902(a)(3) would not warrant remand for several reasons.

First, even if the removal provision in § 902(a)(3) is unconstitutional, it would not have deprived Former Commissioner Saul of the ability to delegate power to others to decide Plaintiff's benefit claim because of the doctrine of severability. As the Supreme Court noted in *Seila Law*, "'one section of a statute may be repugnant to the Constitution without rendering the whole act void.'" 140 S.Ct. 2208 (quoting *Loeb v. Columbia Township Trustees*, 179 U.S. 472, 490 (1900)). Indeed, even in the absence of a severability clause, when "'confronting a constitutional flaw in a statute, [the Supreme Court tries] to limit the solution to the problem, severing any problematic portions while leaving the remainder intact.'" *Id.* (quoting *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 508 (2010)). For that reason, in *Seila Law*, the Supreme Court found that the unconstitutional removal provision was severable from the remainder of the CFPB's governing statutes because the CFPB was capable of functioning independently even if the unconstitutional removal provision was stricken. 140 S.Ct. at 2209–10, 2245. Such is the case here. If the removal provision in § 902(a)(3) is stricken, the Social Security Administration would remain fully functional. *Alice A. v. Comm'r of Soc. Sec.*, Case No. C20-5756, 2021 WL 5514434,

---

[3] The Undersigned does not accept Plaintiff's assertion in his Reply that the Commissioner waived any defense to his separation of power claim with regards to the Appeals Council by failing to address that claim in the Memorandum in Opposition. (Doc. 15 at 10–12). Plaintiff only cursorily mentioned the Appeals Council in her Statement of Errors (Doc. 11 at 15–16), and again, failed to provide the Commissioner with fair notice of her Constitutional claim in her Complaint (Doc. 4). In any event, the claim lacks merit with regard to the Appeals Council for the same reasons that the claim lacks merit with regard to the ALJ.

*6 (W.D. Wash. Nov. 24, 2021) (finding that plaintiff's separation of powers claim failed, in part, because even if § 902(a)(3) was unconstitutional it was severable from the remainder of the statutes governing the Social Security Administration); *Shaun A. v. Comm'r of Soc. Sec.*, Case No. C21-5003-SKV, 2021 WL 5446878, *4 (W.D. Wash. Nov. 22, 2021) (same); *John R. v Comm'r of Soc. Sec.*, 2021 WL 5356719, *8 (same).

In addition, even if the removal provision in § 902(a)(3) is unconstitutional, that would not have automatically rendered Former Commissioner Saul's appointment invalid, and thus, it would not have automatically invalidated his actions, including delegating authority to make benefits determinations or ratifying such delegations.   In *Collins*, the Supreme Court found the unconstitutional removal provision did not render the FHFA's appointments invalid, and thus did not automatically void the FHFA's actions under the Director.   141 S.Ct. 1787 ("Although the statute unconstitutionally limits the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office.   As a result, there is no reason to regard any of the actions taken by the FHFA [that were challenged on appeal] as void.").   Accordingly, infirmities in removal provisions do not automatically void appointments or actions taken by properly appointed officials.   *Alice A. v. Comm'r of Soc. Sec.*, 2021 WL 5514434, *6 (finding that '[t]he infirm *removal* provision does not render Commissioner Saul's *appointment* invalid, which in turn does not render the ALJ's disability determination void.") (emphasis in original); *John R. v Comm'r of Soc. Sec.*, 2021 WL 5356719, *8 (finding that the unconstitutional "removal provision does not render the Commissioner's appointment invalid, and thus does not automatically void the SSA's actions under the Commissioner").

Instead, to obtain reversal of an agency decision, a plaintiff must show "compensable harm" flowing from an unconstitutional removal clause.   *Collins*, 141 S.Ct. 1788–89 (remanding for

further proceedings to determine whether compensable harm to Plaintiff occurred due to the President's inability to remove a Director of the FHFA except for cause). Here, Plaintiff makes no such showing. Plaintiff asserts that her injuries flow from an illegitimate delegation of power, that her harm involves "government actors exercising power which they did not lawfully possess," and that therefore, her harm should be presumed. (Doc. 15 at 16–18). In so doing, Plaintiff appears to conflate issues that might have presumably flowed from the unconstitutional *appointment* of Former Director Saul with a provision allowing for his unconstitutional *removal*. As explained above, however, appointments are not nullified by an unconstitutional removal provision. Nor are actions taken by a properly appointed official.

In short, Plaintiff has not pointed to a connection between any unconstitutional limit on Former Director Saul's removal and the ALJ's determination denying his benefits. *See also Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1138 (9th Cir. 2021) (finding that "there is no link between the ALJ's decision awarding benefits and the allegedly unconstitutional removal provisions. And nothing commands us to vacate the decisions below on that ground."). Nor is it likely that Plaintiff could do so, given that any particular ALJ or Appeals Council decision would not concern the President. *Cf. Collins*, 141 S.Ct. at 1802 (Kagan, J. concurring) ("The SSA has a single head with for-cause removal protection . . . But . . . I doubt the mass of SSA decisions—which would not concern the President at all—would need to be undone . . . . When an agency decision would not capture a President's attention, his removal authority could not make a difference.").

For all these reasons, the Undersigned finds that Plaintiff's separation of powers claim lacks merit. Accordingly, the Undersigned does not reach the Commissioner's alternative arguments including harmless error, de facto officer, the rule of necessity, and other prudential considerations.

## IV.    CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## V.    PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made.  Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


IT IS SO ORDERED.


Date:   June 6, 2022                                /s/ Kimberly A. Jolson
                                                    KIMBERLY A. JOLSON
                                                    UNITED STATES MAGISTRATE JUDGE